# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| Frank P. and Jean M. Sorrano, et al., | ) ) ) |  |
|  | ) |  |
| Plaintiffs, | ) | 96 C 7882 |
|  | ) |  |
|  | ) |  |
| v. | ) | Judge Ronald A. Guzmán |
|  | ) |  |
|  | ) |  |
|  | ) |  |
| New York Life Insurance Co., et al., | ) |  |
|  | ) |  |
| Defendants. | ) |  |
|  | ) |  |

## MEMORANDUM OPINION AND ORDER

This case involves some thirty-four plaintiffs. The case was tried concurrently to the court and to the jury. On August 31, 2001, after four weeks of trial and the presentation of dozens of witnesses and more than one thousand exhibits, the jury returned verdicts on plaintiffs' claims for fraud and negligent supervision and retention. The jury found New York Life ("NYL") liable for negligence as to some plaintiffs, Carmela and Samuel Ciraulo, $206.00, Cathy and Daniel Crivellone, $5004.00, Estate of Dominick Giacomino, $8,116.00, Lena Karczewski, $42,100.00, Timothy Karczewski, $35,348.00, but not as to others; and found for the defendant, NYL, as to all of the common-law fraud counts. The pretrial order reserved for the court the determination of plaintiffs' claims under the Illinois Consumer Fraud and Deceptive

1

Business Practices Act, 815 ILL. COMP. STAT. 505/1 *et seq.* ("the Act" or "ICFA"). The remaining plaintiffs are Joseph & Mary Lobraico, Frank & Jean Soranno, the Estate of Martha Soranno, Lena & Timothy Karczewski, Elroy & Maria Wilke, Raymond & Ann Witczak, Peter Witczak, Paul Giacomino, Pasquale Matranga, Frank Matranga, Catherine Crivellone, Daniel Crivellone, Samuel & Carmella Ciraulo, Lynn Von Boeckmann, William Von Boeckman, Jay Von Boeckmann and Tod Von Boeckmann. (Am. Compl., Count XII.)[1]

To maintain a cause of action under ICFA, a plaintiff must prove: (1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception. *Oliveira v. Amoco Oil Co.*, 776 N.E.2d 151, 160 (Ill. 2002). In the case at bar, each plaintiff must establish that the defendant, NYL, engaged in the misrepresentation or concealment, suppression or omission of any material fact, with the intent that the plaintiff rely upon the misrepresentation, concealment, suppression or omission of such material fact and that they suffered actual damage as a result of the misrepresentation concealment, suppression or omission. The plaintiff's burden of proof under ICFA is a preponderance of the evidence rather than the clear and convincing standard required in the common-law fraud counts submitted to the jury. *Avery v. State Farm Mut. Auto. Ins. Co.*, 746 N.E.2d 1242, 1262 (Ill. App. Ct. 2001); *Cuculich v. Thomson Consumer Elecs., Inc.*, 739 N.E.2d 934, 939-40 (Ill. App. Ct. 2000); *Malooley v. Alice,* 621 N.E.2d 265, 268-69 (Ill. App. Ct. 1993); *Roche v. Fireside Chrysler-Plymouth, Mazda, Inc.*, 600 N.E.2d 1218 (Ill.

---

[1] Only these plaintiffs are named in the The ICFA claim (Count XII).

2

App. Ct. 1992) (stating standard of proof required on statutory fraud claim is lenient, and single transaction is sufficient to establish claim under ICFA). A material fact exists where a buyer would have acted differently knowing the information, or if it concerned the type of information upon which a buyer would be expected to rely in making a decision whether to act. *Mackinac v. Arcadia Nat'l Life Ins. Co.*, 648 N.E.2d 237, 207 (Ill. 1995). Under ICFA, it is unnecessary to plead or prove a common-law duty to disclose in order to state a valid claim of consumer fraud based on an omission or concealment. *Connick v. Suzuki Motor Co., Ltd.*, 656 N.E.2d 584, 595 (Ill. 1996) (citing *Celex Group, Inc. v. Exec. Gallery, Inc.*, 877 F. Supp. 1114, 1129 (N.D. Ill. 1995)); *Totz v. Continental Du Page Acura*, 602 N.E.2d 1374, 1380-81 (Ill. 1992) (stating that the legislature intended the Act to expand the rights of consumers beyond the common law to eliminate all forms of deceptive or unfair business practices). In order to recover damages under the ICFA, a plaintiff must establish that his injury is a direct and proximate result of the alleged violation of the Act. *Petrauskas v. Wexenthaller Realty Mgmt., Inc.*, 542 N.E.2d 902, 909 (Ill. 1989).

Because the elements necessary to prove a cause of action under ICFA are substantially different from a common law fraud claim, and the burden of proof is lower under the ICFA, the plaintiffs' failure to obtain a jury verdict on their common law claims does not preclude a finding for plaintiffs on their ICFA count.

Plaintiffs assert that NYL is liable for the deceptive acts of its agent, David Freitag. Under Illinois law, an agent is a person who acts for a principal in accordance with a consensual arrangement and who is subject to the control or right to control by the principal. *Olympic, Commissary Co. v. Industrial Comm'n*, 20 N.E.2d 86, 89 (Ill. 1939); *Heartly v. Red*

3

*Ball Transit Co.*,176 N.E. 751, 753-754 (Ill. 1931). A principal is liable to third persons for the acts of its agent in the transaction of the business of the principal if the acts are done within the scope of the agent's employment. *Pacific Mut'l Life Ins. v. Haslip*, 499 U.S. 1 (1991); *Ackerman v. Northwestern Mut'l Life Ins. Co.*, 172 F.3d 467 (7th Cir. 1999); *Holley v. Gurnee Volkswagen & Oldsmobile, Inc.*, No. 00 C 5316, 2001 WL 243191 (N.D. Ill. Jan. 4, 2001). The court finds that David Freitag was hired as an insurance agent by NYL. He was trained extensively by NYL as to the different types of products NYL sold and how to sell such products to the public. He was expressly authorized to sell NYL products. He was paid by commission on the products he sold. His NYL supervisor's compensation also was based on the commissions earned by Freitag as well as the other agents he supervised. He was supervised by NYL in all aspects of his sales. He was required to spend certain hours making phone calls and contacts for new clients. He was supervised in the types of representations he could make and although authorized to use NYL's letterhead and logo on his business cards, his use in that regard was also supervised and controlled by the company. He was supervised as to the amount and type of products he sold to particular clients. (Tr. 92.) He was clearly acting as an agent within the scope of his employment for NYL and NYL is liable for Freitag's actions.[2]

From a review of the evidence, the court finds that NYL made the various material misrepresentations both through its agent Freitag and through other employees and

[2] The record supports a finding that NYL is liable for Freitag's conduct on the theory of apparent agency as well. *Indemnity Ins. Co. of N. Am. v. Midwest Transfer Co. of Ill.*, 184 F.2d 633 (7th Cir. 1950); *Letsos v. Century 21-New W. Realty*, 675 N.E.2d 217 (Ill. App. Ct. 1996).

4

officials in the course of conduct involving trade or commerce.[3] These representations took different forms as the relationship between the parties progressed. Initially, Freitag misrepresented the amount of interest that the products would earn and the cash value to each plaintiff. He also misrepresented how quickly the life insurance policies would become self-funding. He misrepresented to plaintiffs that whole life policies were good retirement endowments and good college saving plans. He told them it was smart to use annuities to fund life insurance products and sold them policies that were not suitable for them. (Tr. at 372, 373.) Later on, he misrepresented, both orally and by sending them false statements on company letterhead, the balance of their accounts. Specifically, he misrepresented to Ray Witczak the rate of return or interest he would receive on the annuity he sold to Witczak. (*Id.* at 107.) He also sent a confirmation sheet to Witczak repeating the inflated rate of return. At some point, he told Witczak that the withdrawals he was making on his account with NYL from the pension rollover were only interest and not principal. (*Id.* at 909.) He repeated this lie to Nordic Financial as well to help Witczak obtain a loan. (*Id.* at 119-21.) He sold NYL products based upon the same or similar misrepresentations to Paul & Pat Giacomino, Frank & Jean Soranno, Mary & Joseph Lobraico (*id.* at 879), Elroy & Maria Wilke, Martha Sorrano, Frank Matranga (*id.* at 140, all sales based upon false representations), Cathy Crivellone, Lena Karczewski, Timothy Karczewski and Peter Witczak, (*id.* at 130-42) Carmela & Samuel Ciraulo (*id.* at 156) and others. Even as to

---

[3]Section 1 of the ICFA collectively defines the terms "trade" and "commerce" as: "the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this State." *Premium Plus Partners, L.P. v. Davis*, No. 04 C 1851, 2005 WL 711591, at 20 (N.D. Ill., Mar. 28, 2005) (quoting 815 Ill. Comp. Stat. 505/1).

those products that were sold without misrepresentation, he subsequently made misrepresentations as to the value of the policy through the monthly statements that he sent. (*Id.* at 143). In order to cover up the fact that the plaintiffs' withdrawals were depleting their account balances and that he had lied to them in telling them that they would not have to pay premiums on their accounts, Freitag moved funds from one client's account to another without permission and sometimes even from clients' accounts to his own bank account without anyone at NYL ever questioning the transactions. (*Id.* at 224-51.) He deliberately hid and omitted information about these transactions from the plaintiffs.

Freitag began sending out false monthly statements to plaintiffs at about the time he sold his first fraudulent annuity to Ray Witczak. (*Id.* at 118.) The monthly statements Freitag sent were often in substantially the same format as the annual statements the plaintiffs received directly from NYL. Moreover, the annual statements from NYL also referred the clients to their agent for the "latest guaranteed rate" and any additional information. Plaintiffs who had questions regarding the discrepancies between their annual statements and Freitag's monthly statements did in fact call him for explanations. (*Id.* at 147-48.) Freitag testified that he was the plaintiffs' only contact with NYL.

NYL also engaged in deceptive practices when Freitag oversold insurance to plaintiffs or manipulated their accounts in ways to benefit the company at the expense of the client. (*Id.* at 93, 349 (Witczak), 350 (Giacomino), 351 (Matranga), 351 (Lobraico), 351-53 (Soranno).) Although he was told by his superiors at NYL to go back and correct the situation if he undersold a client NYL products, he was never corrected when he oversold a client. (*Id.* at 93-94.) Freitag testified that the managers at NYL would know in reviewing the applications for

6

the products that they were unsuitable for the plaintiffs, yet NYL managers did nothing to stop these sales. NYL's repeated failures to stop Freitag's improprieties or disclose them to plaintiffs were misrepresentations by omission – the only ones who benefitted from these one-sided reviews of Freitag's sales activites were NYL and Freitag. These are deceptive acts and the premiums and surrender charges that resulted from these acts benefitted NYL at the expense of the plaintiffs.

Plaintiffs claim that they made important financial judgments based upon their belief that they had the cash value reflected in their false statements, on Freitag's misrepresentations that their withdrawals were not depleting their principals, and on NYL's failure to advise them of Freitag's lies. Defendants counter that any damages caused by plaintiffs' financial judgments were not proximately caused by defendants' conduct. Defendants, citing *Movitz v. First National Bank of Chicago*, 148 F.3d 760 (7th Cir. 1998), argue that plaintiffs have failed to establish causation. In *Movitz*, the plaintiff alleged that First National Bank of Chicago had failed to inform him of glaring deficiencies in the real estate investment it procured for him. The *Movitz* court held that the plaintiff was entitled only to the cost of repairing the deficiencies in the building that the bank's evaluation had failed to disclose, *i.e.*, the difference in value between what he believed he was getting as a result of the bank's omissions and what he actually got. Plaintiff was not entitled to be compensated for the loss of his entire investment on the theory that he would never have invested in the building in the first place had he known the truth, as that loss would likely have occurred regardless of the building's condition because it was caused by an intervening event - the dramatic collapse of the real estate market in the area.

7

*Movitz* is distinguishable from the case at bar for these reasons. First, Plaintiffs' damages claims are not predicated upon the theory that they would not have invested at all if they had known the truth. Second, in the present case there is no independent intervening event that would likely have caused plaintiffs' losses regardless of the condition of the product (the annuities and insurance policies) sold to them by NYL as there was in *Movitz*. The only "events" subsequent to the investment that occurred in the case at bar were the continuing material misrepresentations by the defendants and the decisions made by the plaintiffs as to how they would spend the assets they were led to believe they owned by these misrepresentations and omissions. These losses were certainly not the result of the type of independent, unforeseeable, intervening cause that was present in *Movitz*. In *Movitz,* the intervening cause was independent of the misrepresentations made by the defendant. Not so here. In this case there were succeeding and continuous misrepresentations by NYL both through Freitag and, after Freitag's conduct was discovered on Nov. 16, 1992, by other NYL employees and supervisors, that caused plaintiffs' damages to compound. Many, if not all of these subsequent misrepresentations were made at a time when NYL knew or should have known that plaintiffs were, or were reasonably likely to be, operating under drastically erroneous beliefs as to the value of the products NYL had sold them. These subsequent material omissions and misrepresentations formed a chain of causation with Freitag's initial misrepresentations that continued well beyond the initial lies. It is not unreasonable to foresee that a person who believes that he has a certain amount of income available to him will adopt a lifestyle commensurate with that income. That is precisely what

happened in this case.[4] *See Tan v. Boyke*, 508 N.E.2d 390 (Ill. App. Ct.1987):

> In an action for fraud, consequential damages proximately resulting from the fraud are recoverable ... expenses incurred in preparing to use property in a manner the defendant has represented as appropriate are recoverable. Tan clearly believed that the buildings and all of their units were lawful. He went to great expense to secure financing commitments and to meet the financing company's requirements prior to the closing, as was necessary, customary and clearly foreseeable in a $1.7 million real estate transaction.

Id. at 394 (internal quotation marks and citations omitted).

Freitag himself encouraged some of these expenditures. He encouraged the leasing of new automobiles by some of the plaintiffs as a way of building loyalty, which also had the effect of providing more cash for them to invest in NYL products. NYL knew that Freitag had sent false monthly statements not only to the plaintiffs but also to third-party mortgage brokers who were helping the plaintiffs obtain financing. (Tr. at 120-24, 133; PX 327; PX 346.) NYL also was aware that Freitag had arranged for transfers of large sums of money between

---

[4]An excellent example of this is what occurred to the Lobraicos. As Mrs. Lobraico testified, Freitag told them the funds they were getting from their "investments" in NYL and Lincoln were only the interest on the principal invested and not the principal. (Tr. at 818-20, 852.) Mrs. Lobraico testified that she and her husband intended to rely solely on the interest of their investments and based upon Freitag's continuous misrepresentations as to what their interest actually was, they spent down virtually all of the principal. Based upon Freitag's representations and after specifically discussing it with Freitag, they purchased a new home thereby incurring a mortgage as an added expense, even though the home they lived in at the time was fully paid for. Another example is Peter Witczak, who testified that after purchasing annuities from NYL with his profit-sharing money, he began to receive checks from NYL. He spent the money thinking it was only interest as had been represented by Freitag. What happened, of course, is that he unknowingly spent principal - something he had no intention of doing.

accounts of unrelated clients. (Tr. at 225-27.) NYL therefore knew that Freitag's customers, which included the plaintiffs, were making financial decisions based upon their false beliefs as to the value of their investments with NYL. That such decisions, based as they were on erroneous financial information, would result in severe financial damages was clearly foreseeable.

This, of course, is entirely different from the factual situation found in the *Movitz* case. In that case, it was a totally unforeseen downturn in the real estate market after his initial investment that caused plaintiff's damages. The defendant's misrepresentations in that case did not cause or contribute to the downturn in the real estate market. In the case at bar, as we have pointed out above, the damages caused by defendants' wrongdoing were not only foreseeable, they were known and caused in part by the defendants' continued wrongdoing, *i.e.*, Freitag's continuing deceptions and NYL's decision to withhold a full and frank explanation of Freitag's duplicity from the very people to whom he had lied and from whom he had stolen, all in NYL's name and to its profit.

What is also clear from the evidence is that NYL deliberately decided to tell the plaintiffs only part of the truth. At his termination interview, in which he admitted his deceit and misrepresentations to NYL investigators and supervisors, Freitag was told that if anyone found out what was disclosed by him at that meeting it would be because of him and not because NYL told them. Thus, NYL knowingly and deliberately chose to hide the full truth from the defrauded plaintiffs. To make good on this promise, NYL instructed the two secretaries who continued to receive phone calls from Freitag's clients not to tell the clients that Freitag had been fired. (Tr. at 795-96, 798.) Further evidence of this intentional coverup is found in the copy of the initial notice of termination that Freitag received. Incredibly, this U5 form, which NYL sends to the

NASD, listed "insufficient production" as the reason for Freitag's termination. This could not possibly have been an innocent error as Freitag was one of the star salesmen in his region and his production had absolutely nothing to do with his termination. His termination was for misappropriation of funds, unauthorized withdrawals and lying to clients. Approximately five days later, a second U5 form was sent to him indicating misappropriation and unauthorized withdrawals as the basis for his termination. These conflicting U5 notices are undoubtedly a reflection of the debate taking place within NYL as to how much of their internal scandal they could safely hide. This same information was never sent to the plaintiffs. As a result of NYL's decisions, plaintiffs were never made aware of the fact that Freitag had been terminated for lying to them and cheating them. (Tr. at 819-20.)

Subsequently, NYL sent out notices with the history and "true" value of the plaintiffs' assets that invited plaintiffs to contact them if they believed there was any discrepancy. Unfortunately, even this limited disclosure was flawed. The notices did not give the plaintiffs any basis for crediting the new statements over those which Freitag had been sending them for months and on which they had grown to rely. The notices also did not give the plaintiffs any reason to discredit Freitag's information even though NYL knew by then that Freitag had been manipulating accounts for months to convince the plaintiffs of the truth of the statements he had been sending them. (*Id.* at 795.) Some of the letters sent by NYL had as many as one hundred pages of attachments apparently describing past transactions. (*Id.* at 527.) Had NYL simply told the complete truth, the plaintiffs would have had a basis for reevaluating Freitag's credibility. Had they been told that Freitag had lied to them from the very first, that the statements they had been receiving were false and unauthorized, and that Freitag had admitted such and been fired

11

from NYL for his misconduct, then any determination to continue believing in Mr. Freitag would indeed have been an intervening cause of all future losses.[5] But this was not the case.

In choosing to omit this extremely important information, NYL avoided openly admitting its failures and its potential liabilities. The company chose to minimize its exposure at the expense of a full and truthful disclosure to the people whom, by its agent's actions, it had placed at risk. Instead, it chose simply to send what were essentially statements of accounts stating the true value of plaintiffs' investment and the history of their transactions. Unfortunately, as NYL well knew, the plaintiffs already had many such statements from Freitag himself. They were given no basis for discrediting these prior statements. This failure to disclose fully the most crucial of all of the facts, acting in combination with Freitag's prior and continuing manipulations, proximately caused the damages of which plaintiffs now complain. It was not the only cause, but it was certainly a substantial and contributing cause. Had NYL made a substantial disclosure of all material facts, it would not have engaged in any further continuing misrepresentation. Any determination by plaintiffs to continue investing in Freitag's scheme would have been with full knowledge of its fraudulent basis and clearly have been an independent intervening cause.

NYL had, in fact, done precisely that in prior complaints brought against Freitag by his customers. In 1991, NYL corrected a misrepresentation by Freitag to his client, a Ms. Uy. In its letter to Ms. Uy, New York Life stated in plain simple language what Freitag had done that

---

[5] Proximate cause demands a determination that no intervening cause has broken the chain of proximate causation between the allegedly fraudulent statements and the purchase. *Connick,* at 595.

was improper:

> In May of 1989 you withdrew $49,999 via loan
> from your New York Life insurance policy and
> placed it in an annuity account with American
> Investors Life. New York Life agent David Freitag
> has admitted incorrectly advising you that the
> interest rate for this account was 12.2 percent rather
> than 9 percent.

This language is simple, straightforward and frankly describes Freitag's misconduct/mistake; in doing so, it gives the customer, Ms. Uy, all the information she needs to take corrective action. Had NYL made such an open and straightforward declaration to plaintiffs, the subsequent damages could have been avoided. As it is, Freitag was able to maintain the trust of the plaintiffs, which he had gained through lies and manipulations while still employed at NYL.

In large part because of NYL's failure to in any way advise plaintiffs of Freitag's egregious fraud, Freitag was extremely successful in continuing his scheme. He was able easily to convince plaintiffs, almost all of whom were elderly and unsophisticated in financial transactions (at time of trial, Dominick Giacomino was 90 (*id.* at 321), Frank Soranno was 72 (*id.* at 600), Mary Lobraico was 74 (*id.* at 809-11)) and with high school educations (Frank Soranno (*id.* at 602), Ray Witczak ( *id.* at 894)), that he was being forced out of NYL because of some internal rivalries, not because of any wrongdoing on his part. As a result, not only was Freitag able to continue his fraud in his new employment, he was able to obtain letters of recommendation for re-employment from a great many of the people he was victimizing. The Witczaks, Jean and Frank Soranno, Joseph Lobraico, Mr. Giacomino, Nancy Morrison, Catherine

13

Crivellone and Elroy Wilke all wrote glowing letters of recommendation for Freitag which, for the most part, lauded his honesty and services to them while criticizing NYL for its errors and bureaucratic bungling of their accounts. (*Id.* at 267-87, 298.) These letters of recommendation clearly reflect the effect and impact of NYL's decision to omit any mention of Freitag's misconduct from the letters it sent to the plaintiffs. These were omissions of material facts upon which plaintiffs clearly relied to their detriment. The fact that Freitag had lied to them about the interest they were earning, the amount of money they could withdraw and the balances of their accounts, had forged their signatures and used their money without their permission is the type of information that would have caused the plaintiffs to act differently. Or put another way, it is the type of information upon which a buyer would be expected to rely in deciding whether to act.

By the time the plaintiffs received letters from NYL in the spring of 1993, letters that made no disclosure of Freitag's misconduct, they were so dependent upon Freitag that they took the letters to him for an explanation. (*Id.* at 502-16, 523.) This was completely foreseeable for no one had bothered to tell them that Freitag was not trustworthy. When confronted with confusing and contradictory information, almost all of which was on NYL letterhead, it should surprise no one that plaintiffs turned to their long-time agent and only source of personal contact with NYL for an explanation. The evidence clearly establishes that Freitag was able to initiate and accomplish his deception only because NYL placed him in a position to do so by authorizing him as their agent for the purpose of selling their products. NYL was responsible for Freitag's ability to gain the plaintiffs' confidence in the first place, and its subsequent failure to tell plaintiffs the whole truth was clearly a proximate cause of plaintiffs' damages after November 16, 1992, the day Freitag was terminated. The Court can conceive of no reason, other than to

14

protect itself at the expense of its duped clients, for NYL not to have immediately informed the plaintiffs of the full extent of Freitag's wrongdoing. This is precisely the type of deceptive conduct that ICFA forbids.

Freitag opines that Wilke and the others should have known there was something wrong because there were a lot of red flags such as late checks, checks returned for non-sufficient funds, statements that weren't consistent and his termination from NYL and subsequently from Lincoln.[6] However, in Freitag's opinion Wilke did not actually know that something was wrong until two officers from McHenry County questioned him in the middle of 1995. (*Id.* at 343-45.) The reasonableness of reliance is a required element of a common-law fraud claim.[7] It is not, however, an element of an ICFA claim. The issue in ICFA actions is framed in terms of causation:

> [T]he plaintiff's reliance on the defendant's deception is not an element of a consumer fraud claim. *Connick,* 174 Ill.2d at 501, 221 Ill.Dec. 389, 675 N.E.2d at 593. Instead, the plaintiff need show only that the fraud "proximately caused" plaintiff's injury. *Connick,* 174 Ill.2d at 501, 221 Ill.Dec. 389, 675 N.E.2d at 593. *See also Cozzi Iron & Metal Inc. vs. U.S. Office Equipment, Inc.*, 250 F.3d 570, 576 (7th Cir. 2001). Nor need the defendant have intended to deceive the plaintiff; innocent misrepresentations or material omissions intended to induce the plaintiff's reliance are actionable.

---

[6] Many of Freitag's monthly statements contained errors and miscalculations and otherwise would not have survived a thorough analysis or evaluation. Frank Matranga's fraudulent account statements are a good example of this. (Tr. at 448.)

[7] "The law will not allow a person to enter into a transaction with eyes closed to material facts and then claim fraud by deceit. To sustain a claim, plaintiffs must demonstrate that they "justifiably relied on defendant's words or silence." *Miller v. William Chevrolet/GEO, Inc.* 762 N.E.2d 1, 8-9 (Ill.App. Ct. 2001) (citations omitted).

*Duran v. Leslie Oldsmobile, Inc.*, 229 Ill.App.3d
1032, 1039, 171 Ill.Dec. 835, 594 N.E.2d 1355,
1361 (1992).

*Miller v. William Chevrolet/GEO, Inc.*, 762 N.E.2d 1, 12 (Ill. App. Ct. 2001). The Act

also eliminates any requirement that plaintiff be diligent in ascertaining the accuracy of

misrepresentations. *Duran,* 594 N.E.2d at 1361; *Miller*, 762 N.E.2d at 13; Cozzi, 250 F.3d at

576-77; *Grove v. Huffman,* 634 N.E.2d 1184, 1188 (Ill. App. Ct. 1994) (citing *Munjal v. Baird*

*& Warner, Inc.*, 485 N.E.2d 855, 864 (Ill. App. Ct. 1985); *Beard v. Gress,* 413 N.E.2d 448, 452

(Ill. App. Ct. 1980)). So long as plaintiffs establish proximate cause, the damages resulting from

actions taken in reliance upon those beliefs are recoverable.

The evidence shows that Freitag's material misrepresentations induced the

plaintiffs to invest in NYL products. Together, Freitag's continued manipulations and NYL's

intentional concealment from plaintiffs of the full extent of these manipulations resulted in the

foreseeable continued excessive expenditures by plaintiffs of their savings.[8] Defendants'

continued misconduct may not have been sufficient to cause a more sophisticated or less

susceptible victim the type of damages the plaintiffs suffered in this case, but the evidence clearly

shows that this misconduct was directly responsible for the damages resulting to these particular

plaintiffs. For example, when asked why he continued to invest money with Freitag after Freitag

left NYL and went to Lincoln, Frank Soranno answered: "Well, at the time we didn't suspect

anything was wrong with him and he was treating us right. And every time we needed something

---

[8]For example Frank Soranno purchased a new home for $267,000.00 and furnished and
decorated it for $25,000 to $30,000 because he believed that he had available to him the money
reflected in the fraudulent statements sent to him by Freitag while his money was with both New
York Life and Lincoln. (Tr. at 618-23.)

he was there for us and we had confidence in him." (Tr. 616.) The Court finds this testimony believable. From it we draw the clear and reasonable inference that had plaintiffs such as Frank Soranno been told by NYL that Freitag had repeatedly lied to them, they would not have continued to invest their money through him when he went to Lincoln. Had the letter of August 1993 from Nancy Cuozza of NYL told the Sorannos what NYL knew about Freitag's conduct, then the Sorannos would likely have called Ms. Cuozza with their questions instead of going to Freitag for an explanation.[9] They would have been able to avoid spending their life savings in the belief that Mr. Freitag's investments had made them all much better off financially than they really were.

Freitag used a series of deceptions on his victims. He used such concepts as dividends, interest, up-front interest for a whole year, splits in shares, bonuses, purchases of mutual fund shares from each other, etc. to explain to his victims the many statements he sent them about their various policies and investments. (*See, e.g., Tr.* at 866 (Lobraico).) Many of his schemes and explanations had a kernel of truth in that they were no more than exaggerations of sophisticated programs and investments actually available to clients of NYL. (*Id.* at 541.) In addition, Freitag would often call ahead of time to explain to his victims the nature of the particular type of credit they were receiving, which would be reflected in their next (fraudulent)

---

[9]When asked if he and his wife called Ms. Cuozzo for an explanation of the letter, Frank Soranno answered: "No. We talked to Dave. At that time we didn't have no reason to suspect him of anything, wrongdoing, so we had him tell us what to do." This answer not only establishes clearly how the omission of information describing Freitag's misconduct caused the continued reliance upon Freitag, it also establishes clearly that the statistics and descriptions of transactions in the four page letter from New York Life were not sufficient to inform Mr. Soranno, without further explanation, that he had been cheated. Other plaintiffs reacted in the same way, *see, e.g.,* the Lobraicos (Tr. at 862-63) and the Witczaks (*id.* at 918-19, 922).

statement. (*Id.* at 484-85 (Freitag cross-examination)) From the totality of the testimony, the Court is convinced that these elderly and/or unsophisticated plaintiffs were simply unable to comprehend where reality ended and fraudulent exaggeration commenced. Indeed, at the time of his testimony, even Freitag was unable to recall the many twists and turns his deception took without reviewing his personal files which were no longer available. Moreover, the court is convinced that none of the plaintiffs were participants in Freitag's scheme and that their losses were caused by Freitag's misrepresentations in combination with NYL's intentional omissions and failures to inform them of the entire truth through June 1995.

After June 1995, however, the causal chain is broken. There is uncontradicted evidence that in June 1995, Peter Witczak, with the knowledge of Ray Witczak and Frank and Pat Matranga lied to Illinois Department of Securities Investigators when they questioned him about Freitag's misconduct. (*Id.* 445-47.) This court can conceive of no reasonably believable explanation for such behavior by the plaintiffs that does not include knowledge that Freitag had been dishonest in his dealings. The only reasonable explanation for such an investigation from a law enforcement officer is that Freitag was suspected of doing something illegal in his business dealings. Thus, from this point on plaintiffs were, at the very least, on notice that Freitag was suspected of unlawful conduct by a law enforcement agency, Illinois Department of Securities. That they chose to help Freitag thwart the investigation by lying to these law enforcement officers, strongly implies that they were aware of at least some part of Freitag's fraudulent scheme. If they still didn't suspect anything was wrong with Freitag, as Frank Soranno previously indicated when asked why he continued to do business with Freitag, they would not have felt any need to lie to these investigators. At this point, the causal relationship between NYL's conduct

18

and the plaintiffs' losses ends and the misconduct of the defendants ceases to be a proximate cause of the plaintiffs' continued losses.

NYL argues that the ICFA claims are barred by the three-year statute of limitations, 815 ILL. COMP. STAT. 505/10a(e), because plaintiffs filed their complaint on March 29, 1996, but they surrendered their policies and annuities more than three years before that date. Plaintiffs counter that the statute of limitations has not run because defendants concealed their injury. *See Highsmith v. Chrysler Credit Corp.*, 18 F.3d 434, 441 (7th Cir. 1994) (stating that a cause of action under the Consumer Fraud Act accrues when a plaintiff knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused). Defendants appear to argue that plaintiffs knew or should have known of their injuries as of the date they received letters from NYL "which detailed the fraudulent transactions of which they now complain . . . ." (NYL's Mem. Resp. Pls.' Br. Consumer Fraud Act at 2.) This Court disagrees.

As pointed out above, due in large part to NYL's continued withholding of information, plaintiffs did not know and should not reasonably have known of their injuries as a result of Freitag's continuing scheme until long after they received these letters. We have determined that the causal link between the misconduct of the defendants, as manifested by NYL's misrepresentations and material omissions, ceased to be a proximate cause of the defendants' continued losses as of June 1995, when Peter Witczak, Ray Witczak and Frank and Pat Matranga themselves made misrepresentations reflecting the knowledge of serious irregularities in their own transactions with Freitag to the investigators from the Illinois

19

Department of Securities.[10] This is the first evidence of actual knowledge on the part of any of the plaintiffs. Freitag himself testified that he did not believe the plaintiffs knew of his many misrepresentations, and their conduct in continuing to invest and relying upon his advice and judgment indicates that they did not have such knowledge. The record is replete with credible testimony to this effect. It is also clear that NYL's deliberate omissions helped to conceal this knowledge from the plaintiffs. NYL cannot now come before the court and claim that the plaintiffs should reasonably have known of their injuries and the cause of their injuries, when it is NYL's own conduct, its refusal to directly inform the plaintiffs of the cause of their injuries, that kept the truth from them. NYL's intentional material omissions contributed directly to the plaintiffs' ignorance of Freitag's scheme. Defendant now argues that plaintiffs are at fault for not discovering the existence of the scheme from the NYL letters. The Court disagrees. The Court's finding above is that the letters which NYL now argues gave reasonable notice to the plaintiffs, actually furthered Freitag's ability to continue to deceive the plaintiffs. The complaint was filed in November of 1996, and, therefore, before the running of the statute of limitations.

In general, Illinois follows the "benefit-of-the-bargain" approach to measuring damages based upon fraudulent or deceitful conduct *Astor Chauffeured Limousine Co. v. Runnfedlt Investment Corp.,* 910 F.2d 1540, 1552 (7th Cir. 1990). But what was the bargain offered by NYL in this case and how do we measure its value? Freitag actually made numerous misrepresentations at different stages of the fraud. Initially, he misrepresented the percentage return on plaintiffs' investment in order to induce them to commit their savings to NYL products.

---

[10] According to Freitag, Peter Witczak was considered the spokesman for "the Witczaks, Matrangas, pretty much everybody." (Tr. 266)

Subsequently, he misrepresented the earnings and balances on the plaintiffs' investments by sending them the false monthly statements on NYL letterhead. As a supplement to this deception, he also misrepresented to the plaintiffs that the monthly checks they were receiving were just the earnings on their invested moneys and that the principal sum remained undiminished. NYL also misrepresented by omission Freitag's deceptions. Valuing the benefit of this bargain is not as simple as in a case involving a single misrepresentation regarding the attributes of a tangible product, such as, for example, an automobile with an altered odometer.

Some plaintiffs received substantial sums of money by way of "interest" or "dividends" on their investments, while others did not. Some, received more than they originally invested. But even those that received back all of or more than their original investment through these monthly returns, ended up in a worse financial situation than when they entered into NYL's investment scheme because, based upon NYL's misrepresentations, they unwittingly spent down their savings. While such losses might be considered remote damages in a case involving a single misrepresentation, in the case before the court, as we have pointed out above, the continuing misrepresentations and the cover up which allowed the misrepresentations to continue, were clearly the proximate causes of plaintiffs' financial ruination - the end result was clearly foreseeable at the time the many misrepresentations were made.[11]

---

[11] It is fundamental even in cases of intentional tort that the injury suffered by the plaintiff must be the natural and not merely a remote consequence of the defendant's act. *Town of Thornton v. Winterhoff*, 92 N.E.2d 163, 166 (Ill. 1950); *See Brown v. Broadway Perryville Lumber Co.*, 508 N.E.2d 1170, 1176 (Ill. App. Ct. 1987); *see also* W. Prosser, Torts § 110, at 732 (4th ed. 1971).

21

As Prosser has noted, while a transaction may have been induced by a misrepresentation, proximate causation limits recovery to "those damages which might foreseeably be expected to follow from the *character* of the misrepresentation itself." (emphasis added) *Martin v. Heinold Commodities, Inc.*, 643 N.E.2d 734, 748, (Ill. 1994) (citing W. Prosser, Torts § 110, at 732 (4th ed. 1971). In the case before the court we must consider the character of several misrepresentations. The most damaging were Freitag's misrepresentation as to the plaintiffs' ability to spend money without cutting into their investment principal, and NYL's failure to warn the plaintiffs that Freitag's promises were not to be relied upon. The damages which might reasonably be expected to follow from the character and timing of such misrepresentations is that the plaintiffs would unknowingly spend down the corpus of their investment. What plaintiffs lost is not only the money they invested, but the ability to spend their accumulated savings in an orderly and rational manner.

Actually measuring the value of such losses, however, is problematic. The record is insufficient to calculate for each plaintiff all that he or she has lost as a result of the induced expenditures of their savings. Some plaintiffs lost their homes and their financial independence at a time in their lives when they are no longer able to work due to age and infirmity, though they received thousands of dollars from NYL as purported monthly returns on their investments. Such losses cannot be accurately measured. To completely compensate plaintiffs for these losses would require a calculation of how much money it would take to compensate them for the loss of the quality of life which results from the unwitting expenditure of a lifetime of savings after deducting the value of the high quality of life they briefly enjoyed by spending the illusory profits

22

from their NYL investments.[12] In the present case, although plaintiffs clearly suffered damages as a result of NYL's conduct, the exact amount of such losses cannot be calculated, indeed, proof of actual consequential damages was barred by the pretrial rulings of the magistrate judge in part based upon plaintiffs' acknowledgment that they could not and would not offer proof of exact amounts of such losses in their theory of damages.

Defendants argue that plaintiffs suffered no losses when they improvidently spent their NYL investment money because plaintiffs received and enjoyed goods and services in exchange for such expenditures which are, by definition, of equal value to the money spent. In Defendants' view plaintiffs were damaged only if the money they received from NYL during the time their money was invested was less than the amount they originally invested. But Freitag told plaintiffs that they would receive interest on their initial investments, not that they would simply have their principal returned to them. Moreover, measuring plaintiffs' damages as the amount of money they would have made if they had earned the interest Freitag promised them, less the amount of money they in fact received, is far too simplistic. That approach assumes that the only false promise Freitag made was about the rate of return plaintiffs could expect on each investment. Though the proffered return rates were false, Freitag inflicted far more serious damage on plaintiffs by misrepresenting the value of their accounts on the statements he routinely sent to them. Plaintiffs did not buy new cars or homes because Freitag promised them a

---

[12] Aggravation and inconvenience damages are recoverable under the ICFA, *Roche*, 600 N.E. 2d at 1228; as are compensation damages for loss of use, even if no expenses were incurred as a result of the loss of use, *Azimi v. Ford Motor Co.* 977 F.Supp. 847, 853 -854 (N.D.Ill.,1996). In the present case some plaintiffs purchased homes and leased expensive automobiles the use of which they enjoyed for a time, but which were ultimately repossessed, leaving them in worse financial condition than they were in before they invested.

15 percent returned on their money. They made those purchases because he sent them statements that showed their accounts were appreciating at a rapid pace, probably greatly in excess of even the inflated rate he had promised them, even though they were spending some of the money. The result was that even after spending thousands of dollars on new cars and homes, the statements the plaintiffs received from Freitag showed that they still had hundreds of thousands of dollars in their accounts from which to draw on. Because the withdrawals from plaintiffs' accounts seemed to have little impact on their financial health, as reflected in Freitag's statements, plaintiffs continued to spend. Through these statements, NYL and Freitag promised plaintiffs that their investments were doing so well they could spend some of the earnings and still have a substantial amount of money in their accounts. The value of that promise is most accurately measured by the statements plaintiffs received in June 1995, just before they should have discovered Freitag's dishonesty. The balances on those statements, which were supposedly calculated *after* plaintiffs' withdrawals had been debited to their accounts, represents the value of NYL and Freitag's continuing fraudulent promise. Thus, the total balance of each of plaintiffs' accounts as reflected on the June 1995 statements they received from Freitag, is the best measure of damages in this case. Certainly, given all of the factors discussed above, this is not a perfect calculation of plaintiffs' damages. However, in the present case, the very nature of defendants' fraudulent scheme precludes greater precision. Frietag and NYL played a shell game with plaintiffs, hiding Frietag's theft behind a screen of investment products, return rates and statements that changed continually. Freitag's goal was to keep the plaintiffs happy so that they would continue to invest, continue to refer new investors, and never suspect they were being swindled. That tactic, which made it difficult for plaintiffs to ferret out their true financial worth, contributed greatly to the

24

success of the scheme. It also hampered plaintiffs' ability to calculate their precise damages. But defendants, having created and profited by the scheme that prevents a more precise calculation, cannot complain that the damages are too speculative to be recovered. There is no inequity in holding a promissor to its fraudulent promise when that promise was relied upon to the detriment of the defrauded party and the precise losses can not otherwise be calculated.[13]

Based upon the final statements, the Court finds damages in the following amounts: Samuel & Carmella Ciraulo, $59,432.96; Daniel Crivellone, $85,528.47; Daniel & Gina Crivellone jointly, $162,055.26; Catherine Crivellone, $3,986.55; Paul & Pat Giacomino, $351,077.57; Lena Karczewski, $54,570.85; Timothy Karczewski, $71,145.14; Joseph & Mary Lobraico $656,048.24; Pasqual Matranga, $768,582.25; Frank & Jean Sorrano, $339,030.63; Estate of Martha Sorrano, $78,213.96; William Von Boeckmann, $183,240.85; William & Lynn Von Boeckmann, $1,842,347.29; Lynn Von Boeckman $79,500.94; Todd & Bill Von Boeckman $44,939.60; Lynn & Jay Von Boeckmann, $42,931.05; Elroy & Maria Wilke, $2,698,707.83; Ray & Ann Witczak, $982,851.45.

Plaintiffs seek punitive damages. Section 10(a) of the Consumer Fraud Act permits the trial Court, in its discretion, to award punitive damages. 815 ILCS § 505/10(a). The purpose of awarding punitive damages is to punish the wrongdoer and, in so doing, deter that party and others from committing similar wrongful acts. *Kleczek v. Jorgensen*, 767 N.E.2d 913,

---

[13] While damages may not be based on mere speculation or whim, they also need not be established with absolute certainty. *In re Application of Busse*, 464 N.E. 2d 651, 655. Moreover, a presumption of at least nominal damages follows from proof of a legal wrong, *Id.* (citing *Brewer v. Custom Builders Corp.* 356 N.E.2d 565 (Ill. App. Ct. 1976); *Crosby v. City of Chicago*, 298 N.E. 2d 719 (Ill. App. Ct. 1973)) and the existence of nominal damages is sufficient to maintain a cause of action for fraud. *In re Application of Busse*, at 655.

922-23, (Ill. App. Ct. 2002). Punitive damages are penal in nature and generally are not favored under Illinois law. *Black v. Iovino,* 580 N.E.2d 139, 149 (Ill. App. Ct. 1991); *Four "S" Alliance, Inc. v. American Nat. Bank & Trust Co. of Chicago,* 432 N.E.2d 1213, 1217 (Ill. App. Ct. 1982). Punitive damages should only be awarded for conduct that is outrageous, either because the defendant's motive was evil or the acts showed a reckless disregard of others' rights. *Kelsay v. Motorola, Inc.*, 384 N.E.2d 353 (Ill. 1978); *Totz v. Continental DuPage Acura,* 602 N.E.2d 1374, 1386 (Ill. App. Ct. 1992). Punitive or exemplary damages may be awarded when torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others. *Consol. Coal Co. v. Haenni* 35 N.E. 162 (Ill. 1893). A punitive damage award, however, must be supported by an actual damage award, except that nominal damages are sufficient to support an award of punitive damages when there is an invasion of a legal right, such as an intentional tort, or when it is not possible for plaintiffs to prove the amounts of their loss or damages. *Kemner v. Monsanto Co.,* 576 N.E.2d 1146, 1153 (Ill. App. Ct. 1991). This court finds that punitive damages are appropriate in the present case. As we have pointed out above, NYL acted intentionally and willfully in concealing from the plaintiffs the extensive and devastating misconduct of their agent, Freitag. In so doing NYL made a conscious decision to place its well being over that of the plaintiffs. By concealing the full extent of its agent's misconduct NYL chose to protect itself at the expense of the plaintiffs - for whose plight it was responsible. Taking advantage of its position of superior knowledge of the facts, it deliberately chose to limit criticism and potential liability by covering up Freitag's misconduct to the detriment of its clients. Such conduct reflects a conscious disregard for the consequences to the plaintiffs. That

26

Freitag's twisted fraudulent scheme was evil cannot be doubted. The court awards punitive damages in the amount of $8,504,190.89, an amount equal to the total loss to plaintiffs as measured by the value of the last statements issued to them by Freitag.

Plaintiffs also seek an award of attorney's fees. The ILCA does allow for an award of attorney's fees. *Majcher v. Laurel Motors, Inc.*, 680 N.E.2d 416 (Ill. App. Ct. 1997). Such fees have been allowed even for innocent violations of the act. *Grove v. Huffman*, 634 N.E.2d 1184, 1189 (Ill. App. Ct. 1994); *Haskell v. Blumthal*, 561 N.E.2d 1315, 1319 (Ill. App. Ct. 1990). The awarding of such fees is a matter of discretion with the trial court. *See Ekl v. Knecht* , 585 N.E.2d 156, 166 (Ill. App. Ct. 1991). For all of the reasons discussed above, the court feels attorney's fees are appropriate in this case. Plaintiffs shall file a petition for attorney's fees in accordance with Local Rule 54.3.

Dated: June 6, 2005

**SO ORDERED**

**ENTER:**

**RONALD A. GUZMÁN**
**District Judge**